*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 22-CO-0445

BARRY L. STRINGER, APPELLANT,

v.

UNITED STATES, APPELLEE.

Appeal from the Superior Court of the
District of Columbia
(2005-FEL-004970)

(Hon. Julie H. Becker, Trial Judge)

(Argued February 7, 2023                    Decided June 27, 2024)

*Thomas T. Heslep* for appellant.

*Paul Maneri*, with whom *Samia Fam* and *Alice Wang*, Public Defender Service, were on the brief, for amicus curiae on behalf of appellant.

*Eric Hansford*, Assistant United States Attorney, with whom *Matthew M. Graves*, United States Attorney and *Chrisellen R. Kolb*, Assistant United States Attorney, were on the brief, for appellee.

Before EASTERLY,[*] DEAHL, and HOWARD, *Associate Judges*.

---

[*] Associate Judge AliKhan was originally assigned to this case. Following her appointment to the U.S. District Court for the District of Columbia, effective December 12, 2023, Associate Judge Easterly has been assigned to take her place on the panel.

HOWARD, *Associate Judge*: In this appeal, we are asked to explain what qualifies an incarcerated person as "acute[ly] vulnerab[le]" to severe medical complications or death from COVID-19 under the District of Columbia's compassionate release statute. *See* D.C. Code § 24-403.04(a)(3)(B)(iii). Following our 2021 remand order[1] in this matter and an evidentiary hearing, the trial court denied appellant Barry Stringer's[2] motion for compassionate release. On appeal, Mr. Stringer argues that the trial court erred in concluding that his "diabetes, obesity, high blood pressure, and high cholesterol" do not establish his "acute vulnerability to severe medical complications or death as a result of COVID-19." For the reasons set forth below, we deny Mr. Stringer's request and affirm the trial court's decision.

## I.     Legal Framework

Under the District of Columbia's compassionate release statute, a court "shall modify a term of imprisonment" if an incarcerated person can satisfy two requirements by a preponderance of evidence: non-dangerousness and eligibility

---

[1] *See Stringer v. United States*, No. 21-CO-0132 (D.C. June 24, 2021) (Judgment). The mandate issued forthwith.

[2] Barry Stringer, across multiple appeals and proceedings at the trial court, has alternately been referred to as Barry L. Stringer and Barry D. Stringer.

under the terms of the statute. *Colbert v. United States*, 310 A.3d 608, 610 (D.C. 2024) (quoting D.C. Code § 24-403.04(a)). Those requirements, as relevant to this case, include that the movant is (1) "not a danger to the safety of any other person or the community,"[3] and (2) "eligible for release, which generally requires [the movant] to show that they suffer an acute vulnerability to severe medical complications or death as a result of COVID-19[.]" *Id.* (internal quotations omitted).

To demonstrate eligibility, an incarcerated person may show that they satisfy one of two "primary examples," *Autrey v. United States*, 264 A.3d 653, 656 (D.C. 2021), including either: having a "terminal illness" or being "60 years of age or older and ha[ving] served at least 20 years in prison," D.C. Code § 24-403.04(a)(1)-(2); or satisfying something akin to (in the trial court's discretion) "four 'other' illustrative examples in a catch-all provision," *Autrey*, 264 A.3d at 656 (quoting D.C. Code § 24-403.04(a)(1)-(3)). That catch-all provision reads, in pertinent part:

> (3) Other extraordinary and compelling reasons warrant such a modification, including:
>
> . . . (B) Elderly age, defined as a defendant who:

---

[3] To satisfy the dangerousness requirement, an individual must show that the individual is "not a danger to the safety of any other person or the community" based on factors from 18 U.S.C. §§ 3142(g) and 3553(a) and "evidence of the defendant's rehabilitation while incarcerated." D.C. Code § 24-403.04(a).

(i) Is 60 years of age or older;

(ii) Has served the lesser of 15 years or 75% of the defendant's sentence; and

(iii) Suffers from a chronic or serious medical condition related to the aging process or that causes an acute vulnerability to severe medical complications or death as a result of COVID-19; . . . .

D.C. Code § 24-403.04(a)(3)(A)-(B). Despite the terms of Section 24-403.04(a)(3)(B)(iii), "trial courts have generally concluded that under the 'catch[-]all provision, a D.C. prisoner can demonstrate eligibility for compassionate release by showing that they are at risk for severe illness from COVID-19, regardless of age or time served.'" *Colbert*, 310 A.3d at 612 n.1 (quoting *Page v. United States*, 254 A.3d 1129, 1133 (D.C. 2021) (Easterly, J., dissenting)).

To show a risk of severe illness or death from COVID-19, an incarcerated person who has been vaccinated[4] must offer more than "unsubstantiated claims."

---

[4] In *Colbert v. United States*, we clarified that like an incarcerated person who has been vaccinated and remains acutely vulnerable to COVID-19, an unvaccinated incarcerated person:

> may likewise be eligible for release if (1) they had a compelling reason to refuse the vaccine, such as an inability to benefit from it or if the vaccine itself posed a

*Autrey*, 264 A.3d at 659. Rather, an incarcerated person "must show" that they remain "acutely vulnerable to those outcomes despite being vaccinated," and "must do so by a preponderance of the evidence." *Id.* (internal quotation marks omitted).

## II.    Factual and Procedural Background

In June 2003, police found the body of Tilford Johnson in the driver's seat of a vehicle parked in an alley in southeast D.C. *Stringer v. United States*, No. 06-CF-1515, Mem. Op. & J. at 1 (D.C. July 20, 2009); *see also Stringer v. United States*, 301 A.3d 1218, 1220 (D.C. 2023) (same). Following a jury trial, Mr. Stringer was found guilty of murdering Mr. Johnson. A jury convicted Mr. Stringer of felony murder, armed robbery, second-degree murder, and three related firearm counts. *Stringer*, Mem. Op. & J. at 3-4. The trial court sentenced Mr. Stringer to an aggregate term of thirty-six years in prison. On direct appeal, we affirmed Mr. Stringer's convictions, but remanded for the merger of certain offenses and resentencing. *Stringer*, Mem. Op. & J. at 6. After merger, the trial court imposed

---

> meaningful risk to them, or (2) they would remain acutely
> vulnerable to severe medical complications or death as a
> result of COVID-19 even had they vaccinated.

310 A.3d at 613.

the same aggregate prison sentence.[5] Mr. Stringer then filed a compassionate release motion, which was denied and is now on appeal before us.

### A. The Compassionate Release Motion

Mr. Stringer, proceeding without counsel, moved for compassionate release in September 2020 due to the ongoing COVID-19 pandemic. The trial court appointed him counsel, who filed a supplemental motion. In January 2021, the trial court denied his motion. The trial court agreed with the United States' concession that Mr. Stringer had demonstrated "extraordinary and compelling reasons" for release: his Type 2 diabetes and obesity put him at "greater risk of severe consequences from COVID-19." But Mr. Stringer had failed to show that he was "not a danger to the safety of any other person or the community."

Mr. Stringer appealed and moved for summary reversal. In June 2021, this court remanded the matter because it was "unclear whether the trial court analyzed both eligibility and dangerousness under the preponderance of the evidence

---

[5] In 2014, based on new evidence, Mr. Stringer moved under the Innocence Protection Act, D.C. Code § 22-4131 *et seq.*, to vacate his convictions. The trial court denied his motion. Mr. Stringer appealed, and this court remanded that matter to the trial court. *Stringer*, 301 A.3d at 1220.

standard." *Stringer v. United States*, No. 21-CO-0132 (D.C. June 24, 2021) (Judgment). On remand, the trial court allowed the parties to supplement their prior filings. The United States withdrew its earlier concession that Mr. Stringer had demonstrated "extraordinary and compelling reasons" for release because Mr. Stringer had been vaccinated against COVID-19.[6]

## B.     The Evidentiary Hearing

The trial court held an evidentiary hearing on two dates: December 17, 2021, and April 26, 2022. Mr. Stringer introduced expert testimony from Dr. Amir Mohareb, an infectious disease physician at Massachusetts General Hospital and instructor at Harvard Medical School. The trial court qualified Dr. Mohareb as an expert in epidemiology and COVID-19, and the same in prisons. Dr. Mohareb testified about the risks of COVID-19 in prisons, the benefits and limitations of COVID-19 vaccinations, the potential effects of COVID-19 vaccination booster shots, and Mr. Stringer's general risks with respect to COVID-19.

Dr. Mohareb observed that correctional facilities across the country "have had higher rates of COVID-19." As Dr. Mohareb summarized, an incarcerated person who contracts COVID-19 is "more likely to have severe illness or hospitalization,

---

[6] Mr. Stringer received the second of two doses of the Pfizer mRNA vaccine for COVID-19 in March 2021 and a booster dose of the vaccine in January 2022.

they're less likely to have effective or early treatment than they would [have] in the community." Dr. Mohareb based his conclusion on factors common to the carceral setting: "poor ventilation;" "limitations in how individuals can move and separate from one another;" rotations of staff, visitors, and incarcerated persons; and heightened risks for people with "certain medical comorbidities who are older," such as diabetes, hypertension, obesity, and cardiovascular disease. "Anyone who is incarcerated is at a high risk of COVID-19 because they have less control over how they protect themselves from other people," Dr. Mohareb concluded.

Dr. Mohareb stated that COVID-19 vaccines have been a "lifesaving intervention" since vaccines "dramatically reduc[e] the risk of symptomatic infection of severe disease, of hospitalizations, and of death." But, Dr. Mohareb noted, the efficacy of vaccines can be limited for patients who are "older," have "more comorbidit[ies]," or are "immunosuppressed." Such patients could have a "fairly high risk of severe illness if they're hospitalized with COVID, even if they've gotten vaccinated."

Based on his "review of the medical records," Dr. Mohareb concluded that " . . . Mr. Stringer is not immunocompromised, but does have those co-morbidities that put him at a higher risk, and he's a long-term inhabitant of a carceral facility, so I would say he's at high risk." Those comorbidities included, "by virtue of him being

incarcerated;" being "someone who is older;" "on medication for diabetes" and "being screened for diabetes;" "ta[king] medication for high blood pressure [and] high cholesterol;" and, because his "body mass index [wa]s high," "he[ wa]s obese." "And all of those put him at higher risk of developing severe lung disease, severe complications if he were to acquire COVID-19." Dr. Mohareb explained that the risk factors worked "independent of one another," such that "[s]omeone who has two of those risk factors [is] at higher risk than if they were to just have one of those risk factors."

To reduce the risk of reinfection following vaccination, Dr. Mohareb explained, a person may get a booster shot six months after receiving the primary series of the vaccine.[7] Dr. Mohareb confirmed that Mr. Stringer completed his primary series of the vaccine in March 2021, making him eligible for a booster shot in September 2021. Mr. Stringer did not receive his booster shot until January 2022,

---

[7] "Primary series completion was defined as receipt of two vaccine doses for persons who received Phizer-BioNTech, Moderna, or unspecified U.S.-authorized or approved mRNA COVID-19 vaccine, or receipt of one dose for persons who received Janssen." Hannah E. Fast, et al., *Booster & Additional Primary Dose COVID-19 Vaccinations Among Adults Aged ≥ 65 Years—U.S., Aug. 13, 2021-Nov. 19, 2021*, MMWR Morbidity & Mortality Wkly. Rep. 2021 (Dec. 16, 2021), https://www.cdc.gov/mmwr/volumes/70/wr/mm7050e2.htm#:~:text=Primary%20s eries%20vaccine%20product%20is,administered%20for%20the%20second%20do se; https://perma.cc/3E22-YL54. In September 2021, the CDC recommended a third dose ("booster") of an mRNA vaccine six months after completion of the primary series.

"during or after the peak of the Omicron outbreak after repeatedly asking for it . . . four or five months later after he was eligible." This "ma[de Dr. Mohareb] concerned that [Mr. Stringer] would be at future risk of severe complications" because it showed the slowness of the facility to provide preventative care. To Dr. Mohareb, the delay Mr. Stringer experienced—while "unacceptable"—was "completely normal to physicians who take care of patients in carceral settings."

## C.    The Trial Court Order

On May 19, 2022, the trial court denied Mr. Stringer's motion for compassionate release. While Mr. Stringer proved that he was no longer a danger to the community, he failed to show an "acute vulnerability" to severe illness or death from COVID-19.

In reaching this conclusion, the trial court found Dr. Mohareb both "thoroughly credible" and "knowledgeable about all of the areas within his expertise." The court credited the doctor's testimony that "prison inmates as a group are more vulnerable to COVID-19 because of the congregate setting, the inability to social distance or avoid unvaccinated people, and deficiencies in the prison health care system" and that "as compared to other vaccinated prisoners, Mr. Stringer's comorbidities and age make him more vulnerable should he contract COVID-19."

But the trial court found that Mr. Stringer's expert had not addressed "how vulnerable Mr. Stringer himself actually is." While Dr. Mohareb had classified Mr. Stringer as "high risk," Dr. Mohareb

> did not define that term in any way except in relation to people without comorbidities or who are not incarcerated. Most importantly, he did not offer any testimony, either generally or specifically regarding Mr. Stringer, that contradicts or narrows the observation in *Autrey* that the vaccines have generally, at least to date, proven extremely effective at preventing severe illness or death.

The trial court reached this conclusion since Dr. Mohareb had not

> testif[ied], for example, that Mr. Stringer's comorbidities themselves make the vaccine less effective or are more likely to lead to a breakthrough infection. Nor did he identify any other fact that makes Mr. Stringer less likely than other individuals to benefit from the vaccine. In light of these facts, and notwithstanding Dr. Mohareb's use of the term 'high risk,' the Court cannot find that Mr. Stringer is "acutely vulnerable" to severe illness or death under the standard established in *Autrey*.

While the trial court acknowledged Mr. Stringer's level of risk, the court determined that his risk could not "be termed 'urgent,' 'nearly a crisis,' or 'critical,' given that the vaccine remains extremely effective in protecting against severe illness and death."

This timely appeal followed.

## III.    Discussion

D.C. Code § 24-403.04(a)(3)(B)(iii) does not provide a "precise definition of 'acute vulnerability.'" *Autrey v. United States*, 264 A.3d 653, 659 n.13 (D.C. 2021). Our cases, however, make clear that "acute vulnerability" requires a movant to show why they face a "more than an 'above-average' risk, as compared to the general population." *United States v. Facon*, 288 A.3d 317, 336 (D.C. 2023) (quoting *Autrey*, 264 A.3d at 659 n.13). In turn, we conclude that the trial court acted within its discretion when it concluded that Mr. Stringer did not carry his burden to show that he has an "acute vulnerability" to serious injury or death from COVID-19.

### A.    Precedent on "Acute Vulnerability"

In cases under Section 24-403.04(a)(3)(B)(iii), this court has defined "acute vulnerability" based on the requirement articulated in *Autrey v. United States*. While we declined to "hazard a precise definition" of "acute vulnerability" in that case, we observed that acute vulnerability "requires more than 'above-average' risk, as compared to the general population." 264 A.3d at 659 n.13 (quoting *Acute*, *Webster's Third New International Dictionary Unabridged* 23 (2020) (defining "acute" as "serious, urgent, and demanding attention; intensified or aggravated

nearly to a crisis, culmination, or breaking point: extreme, severe, critical")).[8] We then concluded that an incarcerated person "cannot rely on the mere possibility of residual risks without evidence that those risks actually exist, apply to the prisoner, and rise to the level of an acute vulnerability." *Id.* at 659. The appellant had "a host of comorbidities generally increasing his risk of severe illness or death from COVID-19"—including obesity, diabetes, hyperlipidemia, hypertension, and asthma. *Id.* at 654-55, 659. But the appellant presented no evidence to meet his "burden to demonstrate some acute vulnerability to severe illness or death from COVID-19 despite being vaccinated." *Id.* at 659.

Following *Autrey*, a showing of "acute vulnerability" to severe illness or death from COVID-19 has required more than showing an individual's "heightened susceptibility." *See Facon*, 288 A.3d at 336. In *United States v. Facon*, we remanded a compassionate release appeal so that a trial court could make "particular findings" as to whether an incarcerated person's risk factors rendered him "acutely"

---

[8] Additional dictionaries emphasize that the word "acute" carries a sense of severity and urgency. *See Acute (adj. 1.c)*, *Oxford English Dictionary* (2023), https://doi.org/10.1093/OED/8282842164; https://perma.cc/Z5UH-V7JA (defining "acute" as "severe, intense"); *Acute*, *Merriam-Webster Dictionary* 13 (11th ed. 2014) (defining "acute" as "characterized by sharpness or severity").

vulnerable. *Id.* at 337. The trial court had concluded that an incarcerated person who had obesity, Type 2 diabetes, and hypertension[9] but had been vaccinated had shown a "heightened susceptibility" to COVID-19 since the Pfizer vaccine was not "100% effective at preventing infection or serious complications."[10] *Id.* at 336. We disagreed after concluding that the "more than an 'above-average' risk" requirement of *Autrey* required more than a showing of "heightened susceptibility." *Id.* at 336-37 (quoting *Autrey*, 264 A.3d at 659 n.13).

We made a similar observation in *Colbert v. United States*, 310 A.3d 608 (D.C. 2024). The appellant did not suffer from comorbidities that would leave him "acutely vulnerable to severe illness even if he [had been] vaccinated." *Id.* at 611. But the appellant was sixty-seven years old and "repeatedly" cited age as a risk factor. *Id.* at 614. We declined to uphold a trial court's ineligibility finding where that court "failed to account for—and did not so much as mention—a significant risk factor that Colbert had highlighted for the court: his age." *Id.* at 613. That mattered

---

[9] The United States "acknowledged that the Centers for Disease Control and Prevention had concluded that obesity, Type 2 diabetes, and, possibly, hypertension increase the risk of severe illness from COVID-19," but disputed that the incarcerated person's age and hepatitis C increased his risk. *Facon*, 288 A.3d at 324.

[10] The trial court's focus on the efficacy of the vaccine also "improperly shifted the burden to the government" to disprove the movant's risks of serious illness or death from COVID-19. *Facon*, 288 A.3d at 337.

because "vaccinated or not, eligibility depends on an individualized assessment of the person's risk factors." *Id.*

In short, "acute vulnerability" under D.C. Code § 24-403.04(a)(3)(B)(iii) requires an individualized showing. An incarcerated person has the burden to show by a preponderance of the evidence how *that individual* has "more than an 'above-average' risk, as compared to the general population," and how that risk may, with a reasonable likelihood,[11] lead to an acute vulnerability of severe illness or death from COVID-19 for *that individual*. *Facon*, 288 A.3d at 336 (quoting *Autrey*, 264 A.3d at 659 n.13).

When gauging an individual's acute vulnerability, courts should continue to consider "any reasonable factor"—and "not just vaccination"[12] status—as to

---

[11] We agree with amicus Public Defender Service that the word "vulnerability" focuses on "a person's relative weakness or exposure to harm, not on the absolute likelihood that harm will occur." But that definition does not reduce the showing required for an *acute* vulnerability—that is, an exposure to an "extreme, severe, critical" harm. *See Autrey*, 264 A.3d at 659 n.13 (quoting dictionary definition of "acute").

[12] We emphasize that nothing in this opinion forecloses compassionate release to persons vaccinated from COVID-19 yet still facing serious individual risks. As the trial court here found, incarcerated persons as a group are more vulnerable to COVID-19. And, as amicus Public Defender Service notes, treatments such as Paxlovid have not been readily available in Federal Bureau of Prisons facilities. Vaccinated or not, an incarcerated person must make an individualized showing of risk as required by the language of the statute and our case law.

whether an incarcerated person has shown "an 'extraordinary and compelling' reason warranting a sentence modification." *Autrey*, 264 A.3d at 658 (quoting *Page v. United States*, 254 A.3d 1129, 1130 (D.C. 2021) (Easterly, J., dissenting), and listing factors). In doing so, a judge should exercise their discretion and consider evidence of any factor they find relevant.

Still, an incarcerated person moving for compassionate release bears the burden to show by a preponderance of the evidence the extent to which their medical conditions render them "acutely vulnerable" to severe illness or death from COVID-19. While we still do not demand "conclusive statistical evidence" to meet this standard, an incarcerated person may not "rely on the mere possibility of residual risks without evidence that those risks actually exist, apply to the prisoner, and rise to the level of an acute vulnerability." *Id.* at 659. Finally, we reiterate that, "[g]iven how rapidly the above eligibility calculus can change, it would also be prudent for trial courts in each compassionate release case to decide whether the prisoner has demonstrated their non-dangerousness, regardless of any eligibility determination." *Id.*

### B. Application to Mr. Stringer

Here, the parties only dispute the trial court's eligibility ruling, which we review under the abuse of discretion standard. *See Colbert*, 310 A.3d at 614 (citing

*Facon*, 288 A.3d at 336).  To be sure, the trial court credited Dr. Mohareb's testimony about the heightened risks from COVID-19 that incarcerated individuals face.  And the trial court credited Dr. Mohareb's testimony that "as compared to other vaccinated prisoners, Mr. Stringer's comorbidities and age make him more vulnerable should he contract COVID-19."  But based on the abuse of discretion standard, the definition of acute vulnerability, and the record before us, we have no basis to disturb the trial court's conclusion that "[w]hat Dr. Mohareb did not address . . . was how vulnerable Mr. Stringer himself actually is."

Dr. Mohareb concluded that Mr. Stringer's comorbidities of age, diabetes, obesity, high blood pressure, and high cholesterol put Mr. Stringer at a "higher risk" of "severe complications if he were to acquire COVID-19."  But the trial court determined that Dr. Mohareb "did not define that term in any way except in relation to people without comorbidities or who are not incarcerated."  Consider:

- When asked about the "significance of Mr. Stringer's age" for Mr. Stringer's COVID-19 risks, Dr. Mohareb explained that Mr. Stringer was at "higher risk . . . by virtue of being incarcerated," and by virtue of the way in which "someone who has long-term incarceration kind of behaves like an older person in terms of his health."

- When asked about the "significance of diabetes," Dr. Mohareb explained that "[i]t seems that people who have diabetes are at higher risk of complications from COVID-19."

- When asked about Mr. Stringer's "high blood pressure," "high cholesterol," and "high body mass index," Dr. Mohareb replied that "all of those put him at higher risk of developing severe lung disease, severe complications if he were to acquire COVID-19."

These explanations—framed only in terms of Mr. Stringer's "higher risk" and higher "likelihood" of contracting COVID-19—make it difficult to conclude that Mr. Stringer's risk amounted to a "more than 'above-average' risk, as compared to the general population." *See Facon*, 288 A.3d at 336 (quoting *Autrey*, 264 A.3d at 659 n.13).

We acknowledge that Mr. Stringer faces risk: he bears comorbidities, as the trial court concluded, that make him "more vulnerable" if he contracts COVID-19. And Dr. Mohareb explained that each risk factor functions "independent of one another, meaning that someone who has . . . two of those risk factors [is] at higher risk than if they were to have just one of those risk factors." But, as Dr. Mohareb replied when asked specifically about the significance of high blood pressure: "A risk factor doesn't mean that everyone who has those conditions will necessarily

have severe disease. It just means . . . their likelihood of developing severe disease would be higher than someone who did not have them."

This is not a box-checking exercise. A movant for compassionate release must explain why their particular likelihood of developing COVID-19 rises past "heightened" and to a level that falls under the "serious, urgent, and demanding attention" language first introduced in *Autrey*. *See* 264 A.3d at 659 n.13 (quoting *Acute*, *Webster's Third New International Dictionary Unabridged* 23 (2020)). Our conclusion about whether Mr. Stringer provided a sufficient explanation might differ if Mr. Stringer had shown why his particular combination of comorbidities could make his vaccination less effective or lead to a higher likelihood of a breakthrough infection. *See id.* at 658 (noting that courts may consider whether an incarcerated person's "medical conditions continue to render [them] acutely vulnerable to severe illness or death despite receiving some benefit from the vaccine, which may implicate vaccine efficacy data for certain subpopulations"). But, like the movant in *Autrey*, Mr. Stringer has not presented "evidence to the contrary" to show why his vaccination does not "substantially mitigat[e] his risk." *See id.* at 659.

To be sure, Mr. Stringer introduced evidence that, in general, people who have comorbidities still have a "fairly high risk of severe illness . . . even if they've gotten vaccinated," and that people who are incarcerated do not have control over their

close contacts. Upon reviewing Mr. Stringer's medical records, however, Dr. Mohareb concluded that Mr. Stringer "does have those comorbidities that put him at a higher risk" but is "not immunocompromised." Nor did the trial court observe Dr. Mohareb "identify any other fact that makes Mr. Stringer less likely than other individuals to benefit from the vaccine." Without such testimony, we conclude that the trial court acted within its discretion when it determined that Mr. Stringer failed to meet his burden to show that his individual risks "ris[e] to the level of an acute vulnerability." *See Autrey*, 264 A.3d at 659. And, under our case law, we may not support a determination of acute vulnerability where a movant for compassionate release provides only the "'possibility of residual risks without evidence that those risks actually exist, apply to the prisoner, and rise to the level of an acute vulnerability' even though the prisoner has been vaccinated." *Facon*, 288 A.3d at 337 (quoting *Autrey*, 264 A.3d at 659).

We therefore conclude that the trial court acted within its discretion when it determined that Mr. Stringer's risk from COVID-19—while higher "than other vaccinated persons without his medical conditions"—could not "be termed 'urgent,' 'nearly a crisis,' or 'critical.'"

## IV.   Conclusion

We affirm the trial court's order denying Mr. Stringer's motion for compassionate release.

*So ordered.*